# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

May 28 2015, 9:51 am

CLERK
of the supreme court, court of appeals and tax court

ATTORNEY FOR APPELLANT

Amy P. Payne
Deputy Public Defender
Bloomington, Indiana

ATTORNEYS FOR APPELLEE
INDIANA UNIVERSITY HEALTH

James L. Whitlatch
Kathryn DeWeese
Bunger & Robertson
Bloomington, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

S.M.,

*Appellant-Respondent,*

v.

Indiana University Health, Bloomington Hospital and Centerstone,[1]

*Appellees-Petitioners.*

May 28, 2015

Court of Appeals Case No. 53A01-1409-MH-417

Appeal from the Monroe Circuit Court.
The Honorable Stephen R. Galvin, Judge.
Cause No. 53C07-1409-MH-292

**Garrard, Senior Judge**

---

[1] Although Centerstone was the petitioner for S.M.'s regular commitment, Centerstone is not a named party to and has not otherwise participated in this appeal. However, pursuant to Indiana Appellate Rule 17(A), a party of record in the trial court shall be a party on appeal.

[1] S.M. appeals from the trial court's order involuntarily committing him to a mental health facility, contending that Indiana University Health, Bloomington Hospital ("the Hospital") and Centerstone, did not present sufficient, admissible evidence to support his temporary and regular involuntary commitments and forced medication orders. We affirm.

[2] On September 6, 2014, Monroe County Sheriff's Deputy Garret Creason responded to a call involving S.M. Deputy Creason did not testify at any hearing involving S.M., but did complete a "Statement In Support Of Immediate Detention Of Mentally Ill And Dangerous Person." Appellee's App. p. 1. In that statement and in support of S.M.'s detention, Deputy Creason indicated that others stated that S.M., while outside his residence, was yelling that he was going to "kill white people." *Id.* The deputy noted that he personally heard S.M. yelling inside his residence. *Id.* He further indicated that S.M. told him that he was hearing voices that were racist, threatening him, and were keeping him awake at night. *Id.* S.M. was taken to the Hospital.

[3] That day, Bret Eartheart, an IU Health social worker, completed an "Application For Emergency Detention Of Mentally Ill And/Or Dangerous Person." *Id.* at 2. In that application, Eartheart supported his request by noting that S.M. was dangerous to others because "he believes the neighbors are talking to him through the heating vents of his house and he is angry at them." *Id.* The physician's emergency statement completed that same day by Dr. Kimberly Irvin, an emergency room physician, relied upon information provided by Eartheart and a nurse practitioner and concluded that S.M. "is

suffering from psychosis, has no insight into his mental illness, and is a threat to his neighbors" at that time. *Id.* at 3. An order approving the emergency detention of S.M. was issued that same day.

On September 8, 2014, the Hospital filed a petition for involuntary commitment of S.M. with a physician's statement. Dr. Carey Charles Mayer, a board-certified psychiatrist, stated that he had examined S.M. on that date, and in his opinion, S.M. was suffering from a psychiatric disorder involving paranoid delusions and threats to harm others indicative of paranoid schizophrenia. Dr. Mayer also stated that S.M. exhibited poor judgment, was unable to care for himself, and that S.M. could not be relied upon to take necessary medications himself. S.M. had stopped taking medications after his most recent hospital stay, refused to take medications during his current stay, and refused to allow staff to draw his blood for laboratory tests. Treatment on a voluntary basis was discussed with S.M., but he told Dr. Mayer that he refused. Dr. Mayer requested a temporary commitment for S.M. and an order for forced medications.

The trial court held a hearing on the petition on September 9, 2014, at which Dr. Mayer testified on behalf of the Hospital. He acknowledged being aware of S.M.'s prior hospitalizations, and stated that "[i]t appears now that [S.M.'s] psychosis has gotten worse and is taking a rather alarming . . . tone." Sept. 9, 2014 Tr. pp. 2-3. Dr. Mayer testified that in addition to paranoid schizophrenia, S.M. also suffered from alcohol abuse problems. On cross-examination, Dr. Mayer further testified that his diagnosis that S.M. suffered

from paranoid schizophrenia and his opinion that S.M. was a danger to others was supported by prior information labeling S.M.'s condition as involving "a psychotic disorder, not otherwise specified," the opinions of two doctors who worked closely with S.M. "during this last stay [who] felt this probably is paranoid schizophrenia," and Dr. Mayer's comparison of that with S.M.'s current symptoms. *Id.* at 6-7.

[6] S.M. also testified, stating that he had tried anti-psychotic medication in the past, but that it was not helpful. He testified that he did not believe in the use of medications for treatment, but would be willing to commit to an outpatient treatment program to address potential alcoholism or mental illness. S.M. asked to be released so that he could attend a job interview and care for his pet. *Id.* at 8. He attributed the harassment he suffered at the hands of his neighbors to his alcoholism and described law enforcement's response to his concerns as "negligent." *Id.* at 9. He claimed that people in the community had filed reports against him that were "miscommunicated or falsified." *Id.*

[7] The trial court issued an order of commitment for a period not exceeding ninety days finding that S.M. suffered from paranoid schizophrenia, was a danger to others, and issued a forced medication order for the specific medications Haldol Decanoate, Zyprexa, and Invega Sustenna. S.M. was discharged from the Hospital and transferred to Centerstone on September 23, 2014. S.M.'s temporary commitment was set to expire on December 8, 2014.

[8] On November 18, 2014, Amy Sears of Centerstone completed a report requesting an order for a regular commitment following S.M.'s temporary commitment, citing S.M.'s continuing symptoms of psychiatric disorder and need for continued custody. The accompanying physician's report was completed by Dr. Anne Leach, a Centerstone psychiatrist. Dr. Leach wrote in the report that she had examined S.M. on October 31, 2014, and that he suffered from paranoid schizophrenia and alcoholism. She indicated that S.M. had poor insight into his illness amounting to a denial of his mental illness. She indicated that S.M. had threatened to get a gun because "others were out to get him." Appellee's App. p. 16.

[9] At the hearing on Centerstone's petition, Dr. Leach testified that she had seen S.M. just one time for a shortened appointment because S.M., who was being treated on an outpatient basis, was late. S.M. failed to show up for subsequent appointments. Dr. Leach testified that she believed S.M. remained paranoid, feeling others were out to harm him. S.M. told her that he needed to get a gun, that he would not harm others with it, but that he would use it for protection. S.M. was not complying with his forced medication order, and Dr. Leach sought a forced medication order for injections of Invega Sustenna in addition to an order for regular commitment. She testified that in her opinion S.M. was a danger to others. Her opinion was based on her own conversation with S.M. and by statements S.M. made to his case manager in which he indicated he continued to believe he was being harassed by his neighbors and that they represented a danger to him.

[10] S.M. also testified at this hearing and re-emphasized his belief that his neighbors would take turns standing outside his bedroom window shouting racial slurs at him. S.M. believed they were trying to get him to move out of the neighborhood, and he believed this happened at two separate apartment complexes. He testified that his alcoholism developed in order to help him sleep and that he had endured what he described as "severe emotional abuse, psychological torture" from his neighbors. November 26, 2014 Tr. p. 10.

[11] At the conclusion of the hearing, the trial court issued an order for S.M.'s regular commitment and issued an order for forced medication by injection.[2] The trial court further found that if S.M. complied with the injections, Centerstone could administer the medication orally instead. S.M. appeals from the temporary and regular commitment orders and the forced medication orders.

[12] S.M. contends that the temporary commitment order must be vacated because it was based on inadmissible hearsay. He also claims that both commitment orders must be vacated because they are not supported by clear and convincing evidence that he was a danger to others. S.M. further argues that the forced medication orders must be vacated because they are not supported by clear and convincing evidence. Even though S.M.'s temporary commitment expired on

[2] The trial court's written order authorized forced medication, but unlike the prior order for forced medication did not specify the medication. The only medication discussed at the hearing and mentioned by the trial court in its decision from the bench was Invega Sustenna.

December 8, 2014, and the issues pertaining to that commitment are therefore moot, we address them nonetheless because the issues are of great public importance likely to recur. *In re Commitment of T.K.*, 993 N.E.2d 245, 248 (Ind. Ct. App. 2013), *trans. denied*. Additionally, the trial court took judicial notice of the proceedings involving the temporary commitment during the proceedings involving the regular commitment.

[13]  Our standard of review in these cases calls for us to look to the evidence most favorable to the trial court's decision, and to draw all reasonable inferences from that evidence. *Civil Commitment of T.K. v. Dep't of Veterans Affairs*, 27 N.E.3d 271, 273-74 (Ind. 2015). We do not reweigh the evidence or reassess the credibility of witnesses, and where evidence is in conflict, we view only that evidence which supports the trial court's judgment. *Id.* The petitioner in commitment proceedings bears the burden of proving by clear and convincing evidence that the individual is mentally ill and either dangerous or gravely disabled such that detention or commitment of that individual is appropriate. Ind. Code § 12-26-2-5(e) (2007).

[14]  S.M. challenges the trial court's determination that he was dangerous, contending that the finding was based on inadmissible hearsay, such that it was not supported by clear and convincing admissible evidence. Indiana Code section 12-7-2-53 (1992) defines "dangerous" for purposes of voluntary and involuntary treatment of individuals who are mentally ill as "a condition in which an individual as a result of mental illness, presents a substantial risk that the individual will harm the individual or others." The determination is a

question of fact for the trial court. *In re Commitment of T.K.*, 993 N.E.2d at 249. A trial court need not wait until an individual commits a physical act before making the determination that an individual poses a substantial risk of harm to others. *Id.*

[15] Hearsay evidence was admitted without objection through the testimony of Dr. Mayer in the temporary commitment hearing. To preserve a claim of error in the admission of evidence, however, there must have been a timely objection including the statement of the specific ground for that objection. *Raess v. Doescher*, 883 N.E.2d 790, 797 (Ind. 2008). The failure to object results in waiver of any alleged error. *Reed v. Bethel*, 2 N.E.3d 98, 107 (Ind. Ct. App. 2014). Additionally, a party may not raise an issue for the first time on appeal. *Troxel v. Troxel*, 737 N.E.2d 745, 752 (Ind. 2000). S.M. has waived his challenge to the admission of hearsay evidence due to his failure to object.

[16] Waiver notwithstanding, S.M. acknowledges that under Indiana Evidence Rule 703 experts are allowed to base their opinions on facts in the case that the expert has been made aware of or personally observed, including inadmissible evidence, if it is the type relied upon by experts in the field. S.M. challenges the trial court's alleged use of hearsay as substantive evidence of S.M.'s dangerousness. S.M. is correct that hearsay cannot serve as substantive evidence to support an involuntary commitment. *Commitment of M.M. v. Clarian Health Partners*, 826 N.E.2d 90, 95 (Ind. Ct. App. 2005). However, Dr. Mayer's testimony about his own observations and S.M.'s own testimony adequately support the temporary commitment order. We conclude that the admission of

hearsay testimony was harmless error and was not used by the trial court as substantive evidence.

[17] Dr. Mayer testified that S.M.'s psychosis had progressed to the point that it had taken on an alarming tone and that S.M. was angry at his neighbors. He stated that based upon a review of the medical reports and S.M.'s current symptoms, he could now diagnose S.M. as paranoid schizophrenic. He noted that S.M. had relocated a couple of times in order to avoid those neighbors but that S.M. believed his neighbors persisted in bothering him. Dr. Mayer believed that S.M. was a danger to others and could not be relied upon to take necessary medications himself. S.M. testified that he believed he was being harassed by his neighbors because of his alcoholism and that law enforcement was negligent in addressing his concerns about the harassment. This evidence is sufficient to support the trial court's temporary commitment order.

[18] When considering the petition for an involuntary regular commitment, the trial court took judicial notice of its record from the temporary commitment hearing. Dr. Leach testified in support of the petition that S.M. told her that he felt the need to get a gun for protection because he believed that others were out to get him. She also testified that S.M. was not compliant with the forced medication order. Dr. Leach testified that she believed S.M. remained paranoid and felt that others were out to harm him. She indicated that S.M. had poor insight into his illness amounting to a denial of his mental illness.

[19]     S.M. also testified at that hearing.  He stated that his comment about a gun involved his fear that his neighbors might shoot him.  He claimed that his neighbors would take turns standing outside his bedroom window and shouting racial slurs at him and that they were trying to get him to move out of the neighborhood.  S.M. testified that his response to their behavior was to shout back at them, sometimes he would call the police about their behavior, and that his drinking habit had developed as a coping mechanism.

[20]     There was sufficient admissible evidence to establish that S.M. was dangerous to others.  S.M.'s behavior was deteriorating and his frustration and anger toward his neighbors was increasing.  The psychiatrists properly relied on the reports containing hearsay evidence when arriving at their diagnoses, and although hearsay testimony was admitted during their testimony, there is sufficient admissible evidence to support the commitment orders.

[21]     With respect to the forced medication orders, we note that the forced medication order issued during the temporary commitment hearing included the reference to specific medications.  Those medications and the potential side effects were discussed during the temporary commitment hearing.  There is sufficient, clear and convincing evidence to support that order.

[22]     S.M. correctly notes that the forced medication order made at the time of the regular commitment indicates that medication should be given, but does not specify what medication.  However, the only medication mentioned by Dr. Leach, S.M., and the trial court during the hearing on the petition for regular

commitment was Invega Sustenna. The trial court also noted that if S.M. were to become consistently compliant by taking his medications by injection, Centerstone was allowed the discretion to administer the medication orally.

[23] S.M. seeks to have this forced medication order vacated due to the failure to list a specific medication. Although he has correctly noted the omission in the trial court's order, Indiana Appellate Rule 66(A) provides that "[n]o error or defect in any ruling or order or in anything done or omitted by the trial court . . . is ground for granting relief or reversal on appeal where its probable impact, in light of all the evidence in the case, is sufficiently minor so as not to affect the substantial rights of the parties." Here, S.M. was aware of the medication Centerstone sought to administer to him and had the opportunity to testify about his reluctance to take the medication. We find that the probable impact of the trial court's omission in light of all of the evidence in the case is sufficiently minor to characterize it as harmless error not warranting reversal.

[24] In light of the above, we affirm the trial court's decision.

[25] Affirmed.

Brown, J., and Pyle, J., concur.